## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | | |
|---|---|---|
| Felicia Sanders, *individually and as legal custodian for K.M., a minor*, | ) ) ) | Civil Action No. 2:16-2356-RMG |
| Plaintiff, | ) ) | |
| | ) | **ORDER AND OPINION** |
| v. | ) ) | *This order relates to all consolidated* |
| United States of America, | ) | *cases* |
| Defendant. | ) ) ) | |

This action and fifteen other related actions[1] were filed by surviving victims and the estates of deceased victims who suffered injury or death at the hands of Dylann Roof when he entered a bible study group at Emanuel A.M.E. Church on June 17, 2015, and murdered nine persons with a Glock Model 41 pistol. Under federal law, Roof's narcotics arrest on February 28, 2015, disqualified him from receiving a firearm. Nevertheless, he was able to purchase the Glock pistol from a federally licensed firearms dealer on April 11, 2015 because the FBI's National Instant Criminal Background Check System ("NICS") failed to discover Roof's disqualifying arrest record. Plaintiffs have brought this present action against the United States of America under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671–80, for alleged acts and omissions of federal employees associated with the NICS.

The United States moved to dismiss these actions for lack of jurisdiction and failure to state a claim, asserting that these claims are barred under the discretionary function exception of the FTCA, 28 U.S.C. § 2680(a), the immunity granted federal employees responsible for

---

[1] The Court consolidated this case with following related cases: Civ. Nos. 2:16-2351-RMG, 2:16-2352-RMG, 2:16-2350-RMG, 2:16-2354-RMG, 2:16-2355-RMG, 2:16-2746-RMG, 2:16-2357-RMG, 2:16-2358-RMG, 2:16-2359-RMG, 2:16-2360-RMG, 2:16-2378-RMG, 2:16-2405-RMG, 2:16-2406-RMG, 2:16-2407-RMG, and 2:16-2409-RMG. (Dkt. No. 23.)

providing information to the NICS, 18 U.S.C. § 922(t)(6)(A), and that Plaintiffs fail to state a claim under South Carolina tort law. Plaintiffs opposed the motion and moved for jurisdictional discovery, arguing the Court required a more complete factual record before addressing the Government's jurisdictional claims. The Court agreed and granted Plaintiffs' motions, authorizing extensive jurisdictional discovery. This was apparently the first instance where any party has had the opportunity to obtain discovery regarding NICS procedures and operations. The Government thereafter renewed its motions to dismiss and the parties briefed the issues. The Court held an evidentiary hearing on March 20, 2018, and the parties were allowed to file additional supplemental materials in the weeks following the hearing. With the completion of jurisdictional discovery and the full briefing of the legal issues involved, the Court now rules on the pending motion to dismiss.

## I.  **Legal Standards**

### A.  **The Federal Tort Claims Act**

The FTCA authorizes lawsuits against the United States for wrongful acts or omissions of federal employees acting within the scope of their duties in circumstances where a private person would be liable for similar claims in the jurisdiction where the claim arose. 28 U.S.C. § 1346(b). The FTCA's authorization of actions against the United States constitutes a limited waiver of sovereign immunity, the common law doctrine that prohibited claims against the Government. There are, however, significant exceptions to the Government's waiver of sovereign immunity under the FTCA, the most relevant here being the provision that the Government cannot be held liable "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The discretionary function exception is grounded on the premise that the judiciary should not "second guess"

policy choices of the Executive Branch through private litigation. 28 U.S.C. § 2680(a); *Berkovitz v. United States*, 486 U.S. 531, 536–37 (1988).

A claim falls within the discretionary function exception if two elements are satisfied. First, the challenged conduct must be the product of a discretionary decision in which the governmental conduct was a matter of judgment or choice. However, if law or policy mandated a particular course of action, the discretionary function exception does not apply. *Berkovits*, 486 U.S. at 536 ("[T]he discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. In this event, the employee has no rightful option but to adhere to the directive."). Second, the decision must be "based on considerations of public policy." This second prong limits the discretionary function exception to the kinds of judgments the exception "was designed to shield." *Id.* at 536–37.

In this matter, the Court must determine whether the specific alleged negligent acts or omissions of the federal employees or the federal agency, here relating to the processing of the Roof background check, violated a controlling, mandated legal standard in which the federal employees had no choice but to follow. If the alleged acts or omissions violated controlling law or policy, the discretionary function exception would not apply. On the other hand, if the challenged acts or omissions were the product of a policy judgment or discretionary decision by the agency, the claim is subject to being barred. Further, even if the acts or omissions were the product of a discretionary decision of the agency, such acts or omissions must be related to agency policy. For instance, a federal employee may be said to be exercising discretion in operating a motor vehicle, but a dispute over negligent driving resulting in an accident is not

barred by the discretionary function exception because the act in question does not relate to agency policy.

When the Government asserts that a claim is barred by the discretionary function exception, the burden is on the Plaintiff to demonstrate that the Court has subject matter jurisdiction because the discretionary function exception does not apply. All waivers of sovereign immunity should be "strictly construed" in favor of the Government. *Welch v. United States*, 409 F.3d 646, 651 (4th Cir. 2005). "The federal courts have held consistently that they lack subject matter jurisdiction if the discretionary function exception bars the suit." *Williams v. United States*, 50 F.3d 299, 305 (4th Cir. 1995).

### B. Immunity for claims arising under the NICS

The Government asserts that a specific federal statute, 18 U.S.C. § 922(t)(6), grants immunity to the Government arising out of the failure to prevent the sale of a firearm to an ineligible person through the processing of background checks in the NICS. The statute reads as follows:

> (6) Neither a local government nor an employee of the Federal Government or of any State or local government, responsible for providing information to the national instant criminal background check system shall be liable in an action at law for damages—
>
>> (A) for failure to prevent the sale or transfer of a firearm to a person whose receipt or possession of the firearm is unlawful under this section; or
>>
>> (B) for preventing such a sale or transfer to a person who may lawfully receive or possess a firearm.

18 U.S.C. § 922(t)(6).

When Congress debated creation of the NICS as part of the Brady Act, there was significant concern that making government actors responsible for vetting gun purchasers would result in voluminous lawsuits when that vetting failed. *See generally Brady Handgun Violence*

*Prevention Act: Hearing Before the Subcomm. on Crime and Criminal Justice of the H. Comm. on the Judiciary*, 103d Cong. (1993). Congress's clear intent in enacting § 922(t)(6) was to prevent any assumption of monetary liability for the operation of the background check system. *E.g.*, 139 Cong. Rec. 28,529–30 (Nov. 10, 1993) (rejection of amendment offered to deny immunity where the NICS search was not diligent). It is well settled that the United States may assert any defense of immunity "which otherwise would have been available to the employee of the United States whose act or omission gave rise to the claim, as well as any other defenses to which the United States is entitled." 28 U.S.C. § 2674; *Lomando v. United States*, 667 F.3d 363, 375–76 (3d Cir. 2011); *Medina v. United States*, 259 F.3d 220, 226 n.2 (4th Cir. 2001). These immunity provisions appear to have had the effect Congress intended because this Court can find no other case where a party has attempted to sue the United States for the alleged failure to prevent the sale of a firearm under the NICS system to an ineligible person.

**B.     Motion to Dismiss under Rule 12(b)(1) and 12(b)(6)**

The Government has moved to dismiss these actions pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure. A motion to dismiss under Rule 12(b)(1) represents a challenge to the Court's subject matter jurisdiction. *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006). A challenge to subject-matter jurisdiction may contend either 1) that the complaint fails to allege facts sufficient to establish subject matter jurisdiction or 2) "that the jurisdictional allegations of the complaint [are] not true." *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). Where the sufficiency of the jurisdictional allegations in the complaint is challenged facially, "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns v. United States*, 585 F.3d 187, 192 (2009). If, however the defendant contends "that the jurisdictional allegations of the complaint [are] not true," the plaintiff bears the burden to prove

facts establishing jurisdiction and the district court may "decide disputed issues of fact." *Id.* In that case, because the plaintiff's allegations are not presumed true, "the court should resolve the relevant factual disputes only after appropriate discovery." *24th Senatorial Dist. Republican Comm. v. Alcorn*, 820 F.3d 624, 629 (4th Cir. 2016). And where "the jurisdictional facts and the facts central to a tort claim are inextricably intertwined," so that a challenge to the truth of the jurisdictional facts indirectly challenges the plaintiff's claims on the merits, "the trial court should ordinarily assume jurisdiction and proceed to the intertwined merits issues." *Kerns*, 585 F.3 at 193.

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits the dismissal of an action if the complaint fails "to state a claim upon which relief can be granted." Such a motion tests the legal sufficiency of the complaint and "does not resolve contests surrounding the facts, the merits of the claim, or the applicability of defenses. . . . Our inquiry then is limited to whether the allegations constitute 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (quotation marks and citation omitted). In a Rule 12(b)(6) motion, the Court is obligated to "assume the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations." *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). However, while the Court must accept the facts in a light most favorable to the non-moving party, it "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Id.* To survive a motion to dismiss, the complaint must set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## II.     Factual Background

### A.     Roof's February 28, 2015 arrest for unlawful possession of a controlled substance

On Sunday, February 28, 2015, at 8:45 p.m., Officer Brandon M. Fitzgerald of the City of Columbia, South Carolina, Police Department received a complaint from the security department at the Columbiana Centre Shopping Mall that a white male wearing all black clothing was entering stores and asking suspicious questions, such as how many associates were then working in the store, when the store closed, and when the employees leave the store. (Dkt. No. 43-5.)

The shopping center lies within Lexington County, South Carolina and the city limits of Columbia. The city limits of Columbia are situated predominantly within adjacent Richland County, but a small portion of the city in and around the Columbiana Centre lies within Lexington County. The Columbia Police Department has jurisdiction over the shopping mall as does the Columbia Municipal Court, but the Solicitor for the 11th Circuit, which has jurisdiction over Lexington County, prosecutes cases from arrests at the shopping mall in the Columbia Municipal Court and those arrests are initially processed at the Lexington County Sheriff's Office.

Officer Fitzgerald made contact with the reported suspect, Dylann Roof, who behaved "very nervously." (*Id.*) Roof said he was visiting stores to apply for jobs, but admitted he had not asked any store for an employment application. (*Id.*) Officer Fitzgerald then conducted a consent search of Roof's person, finding orange square strips in a small white bottle. (*Id.*) Roof initially lied that the strips were breath fresheners, but soon admitted that they were Suboxone, a Schedule III narcotic. (*Id.*) Roof admitted that he had no prescription for Suboxone. (*Id.*) Suboxone is prescribed to treat opioid addiction, FDA, *Buprenophrine Drug Label*, NDA 20-732, 20-733, at 43 (2010), and is often used by heroin addicts to control withdrawal symptoms, Deborah Sontag, *Addition Treatment with a Dark Side*, N.Y. Times, Nov. 16, 2013, at A1.

Officer Fitzgerald then arrested Roof for illegal possession of a controlled substance. (Dkt. No. 43-5.) Roof was booked at the Lexington County Sheriff's Office. (Dkt. No. 12-3 at 3.) The following day, March 1, 2015, Officer Fitzgerald applied for an arrest warrant from the City of Columbia Municipal Court. In the affidavit, Officer Fitzgerald averred that he received complaints from store owners regarding Roof, that he responded by making contact with Roof and searching his person, that his search discovered what appeared to be Suboxone, that Roof admitted he did not have a prescription, and that poison control confirmed Suboxone is a Schedule III controlled substance. (Dkt. No. 44-6 at 2.) Judge Russell T. Spencer issued the warrant that same day. The warrant states that the offense occurred within the "Municipality of City of Columbia." (*Id.*) The complicated jurisdictional issues arising out of arrests made at the Columbiana Mall contributed to later confusion concerning the location of arrest-related records when Roof's NICS background check was performed.

On March 2, 2015, Roof was served with the arrest warrant issued by the Columbia Municipal Court, and the Columbia Police Department submitted the incident report regarding Roof's arrest to the National Data Exchange ("N-DEx"), an FBI-managed database. (Dkt., No. 43-7); *see also* FBI, *National Data Exchange (N-DEx) System*, http://www.fbi.gov/services/cjis/ndex. A second copy of the incident report was submitted to N-DEx by the Lexington County Sheriff's Office on March 3, 2015. (Dkt. No. 43-7.) The Lexington County Solicitor's Office filed a criminal complaint against Roof on March 16, 2015, charging him with possession of a controlled substance in violation of S.C. Code § 44-53-370(c). (Dkt. No. 44-28.) A first offense is a misdemeanor. S.C. Code § 44-53-370(d)(2). The FBI has publicly stated that the information in the Roof incident report was sufficient to establish Roof

was disqualified from possessing a firearm under 18 U.S.C. § 922(g)(3) as a drug user. (*See* Dkt. Nos. 44-2; 43-8 at 29.)

## B.    Procedures under the NICS

The FBI administers the NICS, which is charged with performing background checks on persons seeking to purchase a firearm from a federally licensed gun dealer. Federal law provides that upon receipt of a request from a gun dealer for approval of a firearm sale, the NICS must respond with "Proceed," meaning the sale may proceed, "Denied," meaning the sale may not proceed, or "Delayed," meaning the sale may not proceed while further inquiries are made. 28 C.F.R. § 25.6(c)(iv)(A)-(C).[2] The NICS however is authorized to place a request in a delayed status for only three business days, and the gun dealer may proceed with the sale after three business days if a denial has not been issued. *Id.* § 25.6(c)(iv)(B). This tight time window is imposed on a system incredibly stressed by the huge volume of daily inquiries received by NICS, which totaled on average 22,000 per day and 8.2 million per year in 2014. (Dkt. No. 50-1 at 11.)

The initial inquiry from the gun dealer is delivered by telephone or electronically and is assigned to an NICS examiner. The examiners are governed by highly structured Standard Operating Procedures ("SOPs"), which mandate the standards for approval or denial of the firearm sale, what databases the examiners can access and who they may contact for background information. Federal law identifies disqualifying factors for firearm purchases, including a prior felony conviction, a history of domestic abuse, and unlawful use of controlled substances. 28 U.S.C. 922(g). After receipt of an inquiry from a gun dealer, the examiner is directed by the NICS SOPs to three designated databases: the National Crime Information Center ("NCIC") database, the NICS Index, and the Interstate Identification Index ("III"). The NCIC database

---

[2] Thirty states rely on the NICS to perform their background checks, including South Carolina. The other states have established their own background check systems. (Dkt. No. 44-2.)

contains twenty-one "files" of various classes of persons, such as individuals on supervised release, sex offenders, persons subject to protective orders, fugitives, suspected terrorists, and persons who have had prior gun purchase attempts denied. FBI, *About NCIC*, http://www.fbi.gov/services/cjis/ncic. The NICS Index contains an-FBI maintained list of persons prohibited from possessing firearms, with most of these records submitted by the Bureau of Immigration and Customs Enforcement regarding removable aliens. (Dkt. No. 43-2 at 7.) The III System is an index of persons arrested for felonies or misdemeanors, but the information is very abbreviated and provides little substantive information. (Dkt. No. 43-2 at 6; 43-1 at 11 n.2.)

Notably the NICS examiners are denied access to the FBI-administered N-DEx system, a comprehensive federal database created after 9/11 that contains over 500 million criminal justice records. This database includes incident and arrest records, booking reports, pretrial investigations, supervised release reports, photos and identification records. A vast array of agencies have access to N-DEx, including local law enforcement agencies, campus police, railroad security, probation officers, and prisons. *See* FBI, N-DEx Policy and Operating Manual 1.3.3.

If an examiner obtains sufficient information from initial database inquiries to bring into question a purchaser's right to own a firearm but not enough to deny the purchase, the examiner is then instructed to contact local law enforcement agencies to obtain additional information. This commonly involves a request for incident reports, court disposition records and other standard criminal justice information. The examiners are directed to reach out to law enforcement agencies by fax transmissions. (Dkt. No. 44-1 at 10.) The local law enforcement agencies, which in most instances already have provided the very same information to the FBI

via N-DEx, have no legal obligation to respond to the NCIS faxes, and the NICS in 2006 abolished the requirement that a second fax be sent out if no response was received. (Dkt. No. 64-1 at 4.) It is hardly surprising that under such a set of procedures, receipt of timely responses from local law enforcement agencies within the three-day window is not perfect, thereby allowing persons to acquire firearms without NICS examiners accessing potentially critical and disqualifying law enforcement records. Ironically, most of these records vainly requested by NICS examiners from local law enforcement agencies by fax are already in the possession of the FBI in the N-DEx system, which is physically located in the same facility as the NICS in Clarksburg, West Virginia. *See* FBI, *Criminal Justice Information Services (CJIS)*, http://www.fbi.gov/services/cjis.

## C. Roof's unlawful acquisition of a firearm

On April 11, 2015, Roof went to Shooter's Choice, a federally licensed firearms dealer in West Columbia, South Carolina and sought to purchase a Glock Model 41 semi-automatic pistol. Trial Tr. Vol. IV at 659–74, *United States v. Roof*, Crim. No. 15-472-RMG (D.S.C. Dec. 12, 2016); (Dkt. No. 50-1 at 12). As part of the purchase process, Roof completed ATF Form 4473 and Shooter's Choice contacted NICS by telephone to obtain approval of the purchase. (Dkt. No. 50-1 at 12.)

The telephone call from Shooter's Choice was directed to NICS's Dallas-Fort Worth Call Center. (*Id.*) The call was received by a Customer Service Representative ("CSR"), who entered the information from Roof's ATF Form 4473 into a NICS automated system, which automatically queried three databases regarding Roof: the NCIC database, the NICS Index, and the III database. (*Id.*; Dkt. No. 43-8.) The NCIC database and the NICS Index returned no information on Roof, but the III database provided the following limited information:

Charge Literal    MDP, SCH I B,C,D LSD AND SCH II, COCAINE 3RD/SUB

Statute           (44-53-370(B)(1) SC)

Severity          Felony

(Dkt. No. 43-8 at 8.) The Lexington County Sheriff's Office was listed as the arresting agency.

The III database results contained a number of inaccuracies. First, Roof was arrested for a first offense of simple possession of a controlled substance, Suboxone, a misdemeanor, not a felony. Second, Roof was not arrested for a third or subsequent offense of distributing or manufacturing a Schedule I or II narcotic in violation of S.C. Code 44-53-370(b)(1), a felony punishable by up to thirty years imprisonment. Third, he was arrested by the Columbia Police Department, not the Lexington County Sheriff's Office. These were all clerical errors made by the Lexington County Sheriff's Office when Roof was booked into the Lexington County Detention Center on February 28, 2015. *See* Lexington Cty. Sheriff's Office, *Lexington County statement on Dylann Roof gun purchase*, http://www.lex-co.com/sheriff/media.aspx?mid=2330.

Because of the result reported from the III database, the CSR transferred the telephone call from Shooter's Choice to an NICS legal instrument examiner in Clarksburg, West Virginia for additional processing. (Dkt. No. 50-1 at 12.) The examiner received the call at 4:01 p.m. on April 11, 2015. (*Id.*) The examiner confirmed the III database result matched Roof's name, date of birth, height, and weight "and tried to make a quick determination to Proceed, Deny, or Delay the transaction." (Dkt. No. 50-2 at 1.) At 4:04 p.m.—only three minutes after receiving the call—the examiner placed the transaction in a "delayed" status and notified Shooter's Choice that Roof could receive a firearm on April 16, 2015 unless told otherwise by NICS before then. (*Id.*) The transaction was placed in the NICS Delay Queue for further research. (Dkt. No. 50-2 at 1.)

On the next business day, April 13, 2015, another NICS examiner pulled Roof's transaction from the Delay Queue for further research. (Dkt. Nos. 43-8 at 22; 50-2 at 1.) Per standard operating procedures, the examiner first checked internal NICS databases for information about Roof's arrest but found no information beyond what was reported in the III database. (*Id.*)[3] The examiner, continuing to follow the standard operating procedures, then checked the Lexington County Court's website and discovered *State v. Dylann Storm Roof*, Case No. 2015A4021600503. (*See* Dkt. Nos. 43-11; 43-12.) The website accurately identified the pending charge against Roof as "Drugs / Poss. of other controlled sub. in Sched. I to V – 1st offense," a misdemeanor. (Dkt. No. 43-14 at 3.) The website did not name the arresting agency explicitly, but it did name Officer Fitzgerald as the arresting officer with an address of "#1 Justice Square Columbia 29201," which is the headquarters of the Columbia Police Department. (*Id.* at 4.)

The online records available through the court webpage indicated that Roof might be disqualified from a firearm purchase as a drug user, but, per NICS procedures, they were insufficient to establish disqualification. To establish disqualification where there is a recent drug arrest without a conviction, the SOPs require proof that the substance possessed was tested and confirmed to be a controlled substance, or that the arrestee admitted that the substance was a controlled substance. (Dkt. No. 44-29 at 3.) This required the examiner to obtain further details

_____

[3] One of the internal NICS databases the examiner checked on April 13, 2015 was the Disposition Document File ("DDF"). The DDF is an internal NICS repository for offense disposition documents obtained from prior NICS background checks. (Dkt. Nos. 44-1 at 8; 44-14 at 17.) Plaintiffs have repeatedly asserted that the incident report for Roof's arrest was available in the DDF. (*E.g.*, Dkt. Nos. 44 at 19; 62 at 27–28; 63 at 1–2.) That assertion is incorrect. The DDF could not contain documents relating to a prior attempt by Roof to purchase a firearm because Roof had never before attempted to purchase a firearm from an FFL. Thus, it is unsurprising that the record produced by the Government at the Court's request conclusively shows that the incident report for Roof's arrest was not in the DDF in April 2015. (*See* Dkt. Nos. 43-8 at 22; 65-1 ¶¶ 7, 8; 68-1 ¶ 7.)

about the Roof arrest, which were contained in the arresting officer's incident report that the Lexington County Sheriff's Office and the Columbia Police Department each had previously submitted to the FBI via N-DEx. Since the NICS examiners are denied access to the most comprehensive federal criminal justice database, the examiner was unable to obtain the incident report by a simple click of a mouse. Instead, the examiner was compelled to send out faxes in the hope that she could obtain another copy of the previously submitted incident report from the local law enforcement agencies. As the examiner sought to obtain a copy of the Roof incident report, she was initially led astray by the inaccurate information the NICS had obtained from the III database.

The examiner sent an automated fax to the Lexington County Sheriff's Office at 1:58 p.m. on April 13, 2015, requesting a copy of the Roof incident report for March 1, 2015. (Dkt. No. 43-17.) She also sent an automated fax to the 11th Circuit Solicitor's Office 2:00 p.m., requesting the same report. (*Id.*) The Lexington County Sheriff's Office responded to Ms. Conley's fax in approximately two hours, at 4:05 p.m. on April 13, 2015. (*Id.*) The response stated, "No arrest or report for this date. The last arrest was on 2-28-15. Columbia PD will have the report." (Dkt. No. 43-22.)[4] The 11th Circuit Solicitor's Office never responded to the NICS fax. (Dkt. No. 43-17).

Rather than follow the information provided by the Lexington County Sheriff's Office concerning the location of the Roof incident report, the examiner, following the literal requirements of the NICS standard operating procedures, reviewed a list in the NICS database of all law enforcement agencies operating in Lexington County. The City of Columbia was

---

[4] The discrepancy in dates appears to be the date of the incident at Columbiana Mall versus the date of the arrest warrant. The III database reported an incident date of February 28, 2015 and an arrest date of March 1, 2015. (Dkt. No. 43-8 at 28.) The difference in dates does not appear to have caused any confusion as to what incident report was being sought.

erroneously omitted from the list. Reviewing her list of Lexington County law enforcement agencies, she noticed the City of West Columbia and contacted that city in an effort to locate the Roof incident report. (Dkt. Nos. 44-4; 43-3 at 8; 43-6.) The examiner sent an automated fax requesting the incident report to the West Columbia Police Department at 4:07 p.m., April 13, 2015. (*See* Dkt. Nos. 43-17; 44-1 at 13.). At 8:46 a.m., April 14, 2015, the West Columbia Police Department responded, "Not WCPD warrant. This is not a WCPD arrest." (Dkt. Nos. 43-17; 43-23.)

After receiving the negative report from West Columbia, the examiner made no effort to contact the Columbia Police Department, an agency with provides law enforcement services for South Carolina's capital city, because that option was not explicitly provided for in the NICS SOPs. Further, the examiner did not call the Lexington County Sheriff's Office for further details about its earlier fax response, apparently following the NICS practice of not "promot[ing] directly contacting [agencies] in an affirmative manner." (Dkt. No. 50-2 at 12.) Instead, the examiner did nothing more. At 7:15 p.m., on April 16, 2015, Roof returned to Shooter's Choice and obtained the semi-automatic pistol which he would use two months later to murder the pastor and eight parishioners at a Bible study class at Mother Emanuel A.M.E. Church in downtown Charleston.

The examiner made no further effort to follow up about the missing Roof incident report, either before or after the three-day period. This is hardly surprising because, as revealed in the jurisdictional discovery, the NICS practice was to make a single fax inquiry to a law enforcement agency and to attempt no further follow up of any type. (Dkt. Nos. 64-1; 43-1 at 18-19.) This "one and done" practice directly contradicts FBI statements to the public and Congress in NICS operations reports that the NICS "continues to actively seek the missing record information

beyond the three-business-day time frame" and "remains proactive in efforts to enhance criminal history record and disposition reporting." FBI, National Instant Criminal Background Check System, 2007 Operations 12 (2007); *Id.* 2015 Operations 14 (2015).

## III.   Discussion

### A.   Plaintiffs' claims are barred by the discretionary function exception

The record reveals that the FBI's background check system is disturbingly superficial, excessively micromanaged by rigid standard operating procedures, and obstructed by policies that deny the overworked and overburdened examiners access to the most comprehensive law enforcement federal database. Reports by the FBI's Inspection Division and the then FBI Director, James Comey, make much of the fact that the examiners adhered to every policy and procedure of the agency. (Dkt. Nos. 50-1 at 5; 44-2.) The Court finds that is literally correct because the SOPs require the examiners only to send a single automated fax to a law enforcement agency with no expectation or requirement that follow up work be done if the necessary records are not obtained. Since little is required, it was hardly difficult for examiners to complete the modest requirements of the NICS SOPs.

When the Roof examiner was told by the Lexington County Sheriff's Office that the requested record was in possession of the Columbia Police Department, the NICS SOPs instructed her to look at a contact list of all law enforcement agencies in Lexington County, which she did. When Columbia was not listed, she sent an inquiry to a similarly named City of West Columbia. When West Columbia promptly responded it was not the arresting agency, a reasonable and logical procedure would have been to follow the lead already given that the City of Columbia had the arrest record. A simple Google search would have produced the contact information for the Columbia Police Department. But the NICS SOPs did not address this potential situation and NICS practice prohibited any general internet search. (*See* Dkt. No. 43-3

-16-

at 8.)  Consequently, the examiner elected to do nothing.  This may not have met the most minimal standards of common sense or due care, but the examiner did not violate her agency's policy.

The fault here lies in some abysmally poor policy choices made regarding the operation of the NICS.  The most obvious of these poor policy choices was the decision to deny the examiners access to the most comprehensive federal criminal justice database, N-DEx.  The Roof incident report was provided to the FBI via N-DEx by two separate local law enforcement agencies, and Roof would not have obtained approval to purchase the murder weapon if the examiner could have accessed the report.  This would have also saved the examiner in this transaction, and likely many other examiners in thousands of other transactions, a great deal of time and effort in a system that is already tremendously overburdened.

The Court fully understands that the decision to deny the NICS examiners access to the most comprehensive federal database is a policy choice and the FTCA provides the Government immunity for policy choices (even really bad policy choices) under the discretionary function exception.  The Government, nonetheless, argues endlessly and unpersuasively that it was somehow correct in denying its examiners access to this important repository of information.  Having carefully reviewed and considered the Government's arguments, the Court finds the offered explanations to be simple nonsense.

The Government argues that access to N-DEx is restricted to law enforcement agencies and the NCIS system is not a criminal justice agency.  (Dkt. No. 44-25 at 20).  Denial of access to NCIS examiners on this basis makes little sense.  The N-DEx Policy and Operating Manual allows the information to be use for criminal investigations, pretrial release investigations, presentence investigations, prison intake, supervised release investigations, and employment

background checks. FBI, N-DEx Policy and Operating Manual 1.3.4. Performing a background check by a branch of the FBI's Criminal Justice Information Services Division to prevent the *unlawful* acquisition of a firearm by a convicted felon, a person under a court protective order, or a user of illegal drugs constitutes quintessential law enforcement activity. This is every bit or more core a law enforcement activity than an employment background check, which is an allowable use of N-DEx.

Further, the Government has repeatedly asserted a "law enforcement privilege" over portions of internal NICS documents that set forth NICS operating procedures, claiming disclosure "would impede or impair the effectiveness of an investigative technique, method or procedure of the FBI." (*E.g.*, Dkt. Nos. 44-4; 64-1.) Those assertions are irreconcilable with the Government's argument that NICS is not a "criminal justice entity." The Court finds the Government's assertion of a law enforcement privilege over NICS operating procedures constitutes an admission that NICS is a criminal justice agency.

The Government further contends that the Code of Federal Regulations prohibits NICS access to N-DEx by providing an exclusive list of databases to be used by NICS. (Dkt. No. 44-14 at 9.) The regulation referenced provides that NICS will, upon receipt of a background check request, "Search the relevant databases (i.e., NICS Index, NCIC, III) for any matching records." 28 C.F.R. § 25.6(c)(iii); (*see also* Dkt. No. 44-14 at 13 (confirming that is the regulation he referenced)). That regulation was written before N-DEx existed. *Compare* National Instant Criminal Background Check System Regulation, 63 FR 58303-01, 1998 WL 754140 (Oct. 30, 1998) *with* (Dkt. No. 44-14 at 9 (N-DEx was created in response to 9/11)). The Government's construction of the regulation ignores the plain meaning of "relevant databases" to construe a list of databases in a parenthetical, preceded by "i.e." and written almost twenty years ago, as

prohibiting access to a subsequently created, highly relevant database. The Court finds that argument wholly without legal merit.

A Department of Justice Inspector General's audit report, conducted to investigate the shortcomings of the FBI in Dylan Roof's unlawful acquisition of a firearm, states:

> [A] check of the National Data Exchange (N-DEX), an FBI-developed repository of unclassified criminal justice records, would have revealed a prohibiting incident report for the alleged shooter [Dylann Roof], leading INSD [FBI Inspection Division] to recommend the FBI seek to identify and review additional database resources or stakeholders both internal and external to the FBI. FBI officials told us that its NICS Section would need law enforcement approval (by way of the Advisory Policy Board) and a regulation change (28 CFR Part 25) in order to access N-DEX to conduct firearm background checks.

Office of the Inspector General, U.S. Dep't of Justice, Audit of the Handling of Firearms Purchase Denials Through the National Instant Criminal Background Check System ii (2016). The purported need for a regulatory change is not credible for the reasons set forth above. The purported need for approval by the CJIS Advisory Policy Board (Dkt. Nos. 44-14 at 51; 44-25 at 35), likewise is not credible. The CJIS Advisory Policy Board was created by the FBI Director in 1994. FBI, *The CJIS Advisory Process*, http://www.fbi.gov/services/cjis/the-cjis-advisory-process. The Advisory Board makes recommendations to the Director of the FBI regarding "the philosophy, concept, and operational principles of various criminal justice information systems managed by the FBI's CJIS Division." 28 C.F.R. § 20.35(a). It does not have authority to deny an FBI division access to an FBI-managed criminal information database. *See* 28 C.F.R. § 20.35(d). The Court finds that the Director of the FBI has full authority to allow NICS examiners to access N-DEx. He could do this today.

The NICS SOPs contain many other limitations and restrictions that merit further review by the FBI Director in light of this tragedy. The NICS "one and done" approach to the request of information is not defensible, and there must be a mechanism to follow up if no response is

provided to an initial inquiry. Further, if the background check cannot be completed within three days, the NICS should do as it has promised the public and Congress but failed to do—continue its efforts to locate potentially critical information after the three day period. The system's continued reliance on faxes is also dubious and outdated, and its prohibition of its examiners accessing general internet search engines seems hopelessly stuck in 1995. If more financial resources and staff are needed to complete the important task of performing background checks, and keeping firearms out of the hands of illegible people, the Director should be candid with Congress regarding the system's needs and flaws.

The glaring weaknesses revealed in the background check system, however, are the function of distinct policy choices made by the FBI, not violations of specific legal standards. The United States is immune from Plaintiffs' claims because such policy choices fall squarely within the discretionary function exception. The Government's motion to dismiss based on the discretionary function exception is granted.

**B.      The Plaintiffs' claims are barred by the immunity provisions of 18 U.S.C. § 922(t)(6)**

The Court must note from the outset that the Government has blown hot and cold on the issue of whether the specific immunity provisions in the Brady Act, 18 U.S.C. § 922(t)(6), bars the claims of Plaintiffs. The issue was first raised by the Government in its reply brief, then abandoned at oral argument, and asserted again in post-trial briefs. (Dkt. Nos. 50-9; 69 at 63-64; 69 at 27-30). This change of positions is "a distasteful occurrence" and is "not to be encouraged," *United States v. Wheeler*, 886 F.3d 415, 423 (4th Cir. 2018), but the Court is disinclined to find a waiver of congressionally mandated immunity. Plaintiffs fully briefed this issue and addressed it at the evidentiary hearing, and it is obvious to the Court that a claim of negligence in the operation of the NICS system resulting in a prohibited person obtaining a firearm falls plainly within the scope of the Government's immunity.

Plaintiffs seek to avoid the immunity provision by arguing that this action is more like an attack on the operations of the agency, rather than the negligence of individual federal employees. This argument cannot survive minimal scrutiny. The Government cannot act other than through its employees. Their conduct gives rise to any negligence claim. Moreover, if this is actually an attack on the policies of the agency, rather than the conduct of individual employees, the claims necessarily are barred by the discretionary function exception. The Government's motion to dismiss based on immunity under 18 U.S.C. § 922(t)(6) provides a second and independent ground to support the Government's motion.

**C.      South Carolina Tort Law**

Because the Court concludes it lacks subject matter jurisdiction over this case, it does not reach the Government's arguments under Rule 12(b)(6) for dismissal on the merits based on South Carolina's public duty rule and other issues of South Carolina tort law.

**IV.     Conclusion**

The jurisdictional discovery conducted in this matter provided important information concerning how this tragic failure of the FBI's background check system occurred. The examiner's failure to obtain access to Roof's February 28, 2015 drug arrest incident report was critical. Important contributing factors to this failure includes the denial of access to NCIS examiners to the N-DEx database, the NCIS policy of making a single request for records with no follow up to local law enforcement agencies, and the prohibition against examiners using internet search engines to follow leads. Human error also contributed to this failure, including erroneous entries by the Lexington County Sheriff's Office into federal databases and the omission of the City of Columbia from the NCIS list of Lexington County law enforcement agencies. Perhaps the FBI, learning fully the details of the failure of its system in this tragic

series of events, will promptly take corrective steps to prevent a similar failure of the system in the future.

Despite clear evidence of system failures in the federal background check system, it is manifest that under the well-established standards of the FTCA and the specific immunity provisions contained in Brady Act provide the victims of this tragedy no remedy at law. In exceptional circumstances, Congress may authorize a private bill to provide for compensation to victims where there is no remedy at law. *See, e.g.*, Act for the relief of sixteen employees of the Charleston Naval Shipyard, Private L. No. 98-12, 98 Stat. 3419 (1984) (private bill sponsored by Sen. Strom Thurmond). This is ultimately a determination of Congress. This Court has set forth detailed factual findings that may be of some assistance to Plaintiffs if they wish to petition their Government for a private relief bill. The Government's motion to dismiss is granted.

**AND IT IS SO ORDERED**.

Richard Mark Gergel
United States District Judge

June 18, 2018
Charleston, South Carolina