IN THE UNITED STATES DISTRICT COURT
IN THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Felicia Sanders, individually and as Legal Custodian for K.M., a minor, | ) ) ) | C/A No. 2:16-2356-MBS (lead case) |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | **ORDER AND OPINION** |
| The United States of America, | ) ) | |
| Defendant. | ) ) ) | |

     The Brady Handgun Violence Prevention Act, or Brady Act, established the first nationwide system for background checks. <u>New York v. U.S. Dep't of Defense</u>, 913 F.3d 423, 427 (4th Cir. 2019) (citing Pub. L. No. 103-159, 107 Stat. 1536 (1993)). Under the Brady Act, a background check is required for firearms sales by licensed dealers. The Brady Act directed the Attorney General to establish a national database that would be accessible to the firearms dealers tasked with ensuring these background checks were performed. <u>Id.</u> The Attorney General established the National Instant Criminal Background Check System (NICS) and delegated control of the system to the Federal Bureau of Investigation (FBI). The Brady Act is codified at 18 U.S.C. § 922. The regulations under which NICS operates are set out in 28 C.F.R. Ch. 1, Pt. 25, Subpart A. The FBI also has promulgated certain standard operating procedures (SOPs) to direct the activities of NICS.

     These consolidated cases are brought under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671-2680. The FTCA provides that:

> The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.

Plaintiffs are survivors or estates of the decedents or otherwise victims of a shooting by Dylann Roof at Emanuel AME Church in Charleston, South Carolina, on June 17, 2015. Roof entered a Bible study class and, after spending an hour with the parishioners, opened fire and killed Rev. Clementa Pinckney, 41; Myra Thompson, 59; Sharonda Coleman-Singleton, 45; Rev. Depayne Middleton-Doctor, 49; Cynthia Hurd, 54; Rev. Daniel Simmons, 74; Ethel Lance, 70; Susan Jackson, 87; and Tywanza Sanders, 26. Plaintiffs allege that the negligence of Defendant United States of America allowed Roof to purchase the weapon he used during the shootings.

## I. FACTS

The facts generally are undisputed. On February 28, 2015, Roof was questioned by Officer Fitzgerald of the Columbia Police Department about an earlier incident at the Columbiana Centre Mall in Columbia, Lexington County, South Carolina. During questioning, Officer Fitzgerald found in Roof's possession a bottle of Suboxone, which can be used as a recreational drug. Suboxone is a Schedule III controlled substance under 21 U.S.C. § 802. Roof admitted he was in possession of the controlled substance and that he did not have a prescription. Officer Fitzgerald arrested Roof and charged him with possession of a Schedule III drug. Roof was booked at the Lexington County Sheriff's Department. On March 1, 2015, an arrest warrant was issued by the Columbia Municipal Court. Roof was served with the arrest warrant on March 2, 2015, and the Columbia Police Department submitted the incident report regarding Roof's arrest to the National Data Exchange (N-DEx), an FBI-managed data base. The Lexington County Sheriff's Department submitted a second copy of the incident report to N-DEx on March 3, 2015. The Lexington County Solicitor's Office filed a criminal complaint against Roof on March 16, 2015, charging him pursuant to S.C. Code Ann. § 44-53-370(c) with possession of a controlled substance, which, as a first offense, is a

misdemeanor.

On April 11, 2015, Roof went to Shooter's Choice in West Columbia, South Carolina, to purchase a Glock Model 41 semi-automatic pistol. Shooter's Choice initiated a background check on Roof through the NICS, as mandated by federal and South Carolina law. The NICS, upon receipt of a request for a background check, may respond in one of three ways: "Proceed," "Denied," or "Delayed." 28 C.F.R. § 25.6(c)(iv)(A)-(C). The "delayed" status is to allow for further inquiries, but expires after three business days. If a denial is not issued before the expiration of the three-day time period, the dealer may go ahead with the sale.

In this case, the initial inquiry from Shooter's Choice was handled by a NICS customer service representative, who entered Roof's ATF Form 4473 into an NICS automated system that automatically queried the databases of the National Crime Information Center (NCIC), the NICS Index, and the Interstate Identification Index (III). The III returned a felony arrest for Roof for manufacturing or distributing a Schedule I or II narcotic, third or subsequent offense, in violation of S.C. Code Ann. § 44-53-370(B)(1).[1] The customer service representative then transferred the call from Shooter's Choice to an NICS examiner for additional processing. The examiner confirmed the III database result matched Roof's identification and then placed the inquiry into a "delayed" status. The examiner notified Shooter's Choice that Roof could purchase the firearm on April 16, 2015, unless told otherwise.

The next business day, April 13, 2015, a second examiner reviewed the transaction and checked the databases again, but found no additional information. Following the FBI's SOPs, the

---

[1] It appears the information appertaining to Roof's arrest was incorrectly entered into the system by Lexington County Sheriff's Department employees.

3

second examiner verified the existence of the criminal action on the Lexington County court's website. The website accurately identified the misdemeanor charge and named Officer Fitzgerald as the arresting officer with the street address of "#1 Justice Square Columbia 29201," the street address of the Columbia Police Department.

Once the NICS examiner found that Roof had been charged but not yet convicted of a drug offense, the examiner was required under the SOPs to ensure that the substance possessed was tested and confirmed to be a controlled substance, or that the arrestee had admitted the substance was a controlled substance. To obtain this information, the examiner was obligated to contact the state point of contact (POC), the courts, district attorneys, probation offices, arresting agencies, etc. to obtain a copy of the incident report. The examiner sent fax communications to the Lexington County Sheriff's Department and to the Lexington County Solicitor's Office requesting a copy of the incident report "for March 1, 2015." The Lexington County Sheriff's Department responded: "No arrest or report for this date. The last arrest was on 2-28-15. Columbia PD will have the report." The Solicitor's Office did not respond to NICS's inquiry.

Next, the examiner, still following the SOPs, reviewed a list in the NICS database of all law enforcement agencies operating in Lexington County. The City of Columbia erroneously was omitted from the list.[2] The examiner noticed the City of West Columbia on the list and sent a fax requesting the incident report from the West Columbia Police Department. The morning of April 14, 2015, the West Columbia Police Department responded, "Not WCPD warrant. This is not a WCPD arrest." The examiner took no further action, even though additional internal resources were available to her, and the SOPs mandate that "every effort must be made to obtain necessary

---

[2] Columbia is located in both Richland and Lexington Counties, South Carolina.

4

information, in order to reach a final decision on a NICS transaction during the research phase." ECF No. 84-6, 2 .

Roof purchased the Glock on April 16, 2015. There is no dispute that the information in the Columbia Police Department incident report would have been sufficient to establish Roof was an unlawful user of a controlled substance who could not lawfully possess a firearm. See 18 U.S.C. § 922(g)(3).

These actions initially were assigned to the Honorable Richard Mark Gergel. Defendant filed its first motion to dismiss on October 14, 2016. On March 23, 2017, Judge Gergel issued an order denying Defendant's motion without prejudice and ordering jurisdictional discovery. After extensive discovery, Defendant filed a second motion to dismiss for lack of jurisdiction on November 30, 2017. Judge Gergel held a hearing on the motion to dismiss on March 20, 2018, during which he directed the parties to submit additional information for clarification. After reviewing the exhaustive record, Judge Gergel issued an order and opinion granting Defendant's motion to dismiss on June 18, 2018. Judge Gergel determined that Plaintiffs' claims were barred by the discretionary function exception to the FTCA. The discretionary function exception arises when a party wishes to sue the government for a claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). Judge Gergel determined that the examiner's acts were a function of distinct policy choices made by the FBI pursuant to its charge to administer the NICS.

Judge Gergel also found that Plaintiff's claims are barred by the immunity provisions of 18 U.S.C. § 922(t)(6), which provides:

(6) Neither a local government nor an employee of the Federal Government or of any State or local government, responsible for providing information to the national instant criminal background check system shall be liable in an action at law for damages–

(A) for failure to prevent the sale or transfer of a firearm to a person whose receipt or possession of the firearm is unlawful under this section; or

(B) for preventing such a sale or transfer to a person who may lawfully receive or possess a firearm.

Plaintiffs appealed on August 10, 2018. On August 30, 2019, the Fourth Circuit issued an opinion in which it stated that the Brady Act implementing regulations and the FBI's SOPs mandate in detail the process an NICS examiner must follow when performing background checks. The Fourth Circuit held that, although the examiner was bound to follow mandatory directives set out in the SOPs, particularly SOP 5.5.5, she failed to do so because she did not contact the arresting agency. Under this scenario, the discretionary function exception does not insulate Defendant from liability. The Fourth Circuit also found that § 922(t)(6), by its plain text, grants immunity only to a local government or an employee of the federal or state government, and then only if the actor is responsible for providing information to the NICS system. Accordingly, the Fourth Circuit reversed and remanded.

Plaintiffs filed an amended complaint on November 29, 2019. Plaintiffs assert the following causes of action:

### COUNT I
### NEGLIGENCE, CARELESSNESS,
### GROSS NEGLIGENCE AND RECKLESSNESS

### A.  FAILURE TO FOLLOWING FBI NICS POLICY

### 1.  FAILURE TO CONTACT ARRESTING AGENCY – COLUMBIA POLICE DEPARTMENT TO OBTAIN INCIDENT REPORT

36.    Each and every allegation set forth above is repeated and reiterated as if set forth verbatim herein.

37.    Federal statutory law and/or Federal regulations and/or Federal policy, including S.O.P. 5.5.5 (Exhibit 6), mandated that the second examiner was required to contact Columbia Police Department, the arresting agency, to obtain the Incident Report and/or Arrest Warrant and/or make a determination to make a determination based upon available information as to whether the receipt or transfer of a firearm would be in violation of Federal or state law.

38.    An FBI NICS South Carolina City/County List contained data available to the second examiner during the performance of the Roof background check by the FBI NICS Operation Center in April, 2015 (Exhibit 7 attached)

39.    The South Carolina City/County List as of April 11, 2015, reflected that the City of Columbia was located in Richland County.

40.    As of April 11, 2015, an FBI NICS contact list for Richland County was available to the second examiner showing contact information sufficient to have allowed her to contact the Columbia Police Department.  (Exhibit 8 attached).

41.    During the Roof Transaction the second Examiner did not search the South Carolina City/County List or the Richland County Contact List.

42.    During the NICS transaction in April, 2015, referred to above, Defendant undertook the duty to perform the Roof semi-automatic Glock pistol background check but was negligent, careless, grossly negligent and reckless in failing to search the available City/County List and the available Contact List for Richland County in order to enable the second examiner to contact the Columbia Police Department to obtain the Incident Report from the Columbia Police Department (Exhibit 1), and/or in otherwise failing to conduct the background check in a reasonable manner.

43.    During the NICS transaction in April, 2015, referred to above, the Incident Report from the Columbia Police Department (Exhibit 1) was available from the Columbia Police Department as of April 11, 2015.

44.    If Defendant had complied with the mandatory and non-discretionary Federal statutory law and/or Federal regulations and/or Federal policy which mandated the second examiner to perform a proper search so as to enable the second examiner to contact the Columbia Police Department, the arresting

agency, and the agency that the second examiner had been expressly told had the incident report, the FBI NICS Operation Center would have obtained the Columbia Police Department Incident Report.

45.    If the NICS Operation Center had obtained the Columbia Police Department Incident Report, Roof would not have been permitted to purchase the semi-automatic Glock pistol he purchased on April 16, 2015, used to murder nine parishioners and to attempt to murder others on the attack on Mother Emanuel AME Church in Charleston, South Carolina.

## 2.  FAILURE TO CONTACT SLED TO OBTAIN NARRATIVE REPORT

46.    Federal statutory law and/or Federal regulations and/or Federal policy, including S.O.P. 5.5.5 (Exhibit 6), mandated that the second examiner was required to contact the state POC (SLED) [South Carolina Law Enforcement Division] to obtain the Incident Report and/or Arrest Warrant and/or make a determination to make a determination based upon available information as to whether the receipt or transfer of a firearm would be in violation of Federal or state law.

47.    An FBI NICS South Carolina processing page contained data available to the second examiner during the performance of the Roof background check by the FBI NICS Operation Center in April, 2015.

48.    The South Carolina processing page reflected a fax and/or phone number which could be used to contact the state POC (South Carolina Law Enforcement Division) as of April 11, 2015.

49.    During the NICS transaction in April, 2015, referred to above, the second examiner was negligent, careless, grossly negligent and reckless in failing to contact the POC (SLED) to obtain the narrative of the Incident Report of the Columbia Police Department (Exhibit 1), and/or to obtain clarification as to the Columbia Police Department Contact information.

50.    During the NICS transaction in April, 2015, referred to above, the narrative of the Incident Report from the Columbia Police Department was available from SLED as of April 11, 2015, and SLED was in possession of contact information as to the Columbia Police Department.

51.    If Defendant had complied with the mandatory and non-discretionary Federal statutory law and/or Federal regulations and/or Federal policy which mandated the second examiner to contact the state POC (SLED), the FBI NICS Operations Center would have obtained the narrative of the Incident

Report from SLED and/or the Columbia Police Department.

52.    If the FBI NICS Operation Center had obtained the narrative of the Incident Report of the Columbia Police Department, Roof would not have been permitted to purchase the semi-automatic Glock pistol purchased on April 16, 2015, used to murder nine parishioners and to attempt to murder others in the attack on Mother Emanuel Church in Charleston, South Carolina.

### 3. FAILURE TO CONTACT LEXINGTON COUNTY COURT TO OBTAIN ARREST WARRANT

53.    Federal statutory law and/or Federal regulations and/or Federal policy, including S.O.P. 5.5.5 (Exhibit 6), mandated that the second examiner was required to contact the Lexington County Court to obtain the Incident Report and/or Arrest Warrant to make a determination based upon available information as to whether the receipt or transfer of a firearm would be in violation of Federal or state law.

54.    An FBI NICS South Carolina Contact List for Lexington County contained data available to the second examiner during the performance of the Roof background check by the FBI NICS Operation Center in April, 2015.

55.    The South Carolina Contact List for Lexington County reflected a fax and/or phone number which could be used to contact the Lexington County Court or Clerk of Court.

56.    During the NICS transaction in April, 2015, referred to above, the second examiner was negligent, careless, grossly negligent and reckless in failing to contact the Lexington County Court or Clerk of Court to obtain the arrest warrant attached hereto as Exhibit 2.

57.    During the NICS transaction in April, 2015, referred to above, the arrest warrant attached hereto as Exhibit 2 was available from the Office of the Clerk of Court for Lexington County as of April 11, 2015.

58.    If the Defendant had complied with the mandatory and non-discretionary Federal statutory law and/or Federal regulations and/or Federal policy which mandated the second examiner contact the Lexington County Court, the FBI NICS Operation Center would have obtained the arrest warrant (Exhibit 2) for the arrest of Dylann Roof.

59.    If the FBI NICS Operation Center had obtained the arrest warrant for the arrest of Dylann Roof, Roof would not have been permitted to purchase the

9

semi-automatic Glock pistol he purchased on April 16, 2015, used to murder nine parishioners and to attempt to murder others in the attack on Mother Emanuel AME Church in Charleston, South Carolina.

60.    If the FBI NICS Operation Center would have obtained the arrest warrant for the arrest of Dylann Roof, the FBI NICS Operation Center would have been made aware of contact information as to the Columbia, South Carolina Police Department, such information being sufficient for the FBI NICS Operation Center to have contacted the Columbia, South Carolina Police Department to obtain the Columbia Police Department Incident Report.

## COUNT II
## (NEGLIGENCE, CARELESSNESS,
## GROSS NEGLIGENCE AND RECKLESSNESS)

## A. FAILURE TO FOLLOW FEDERAL REGULATION MANDATING SEARCH OF NICS INDEX

61.    Each and every allegation set forth above is repeated and reiterated as if set forth verbatim herein.

62.    Federal statutory law and/or Federal regulations and/or Federal policy mandated the second examiner was required to search the relevant databases (i.e., NICS Index, NCIC, III) for any matching records and deny the transaction when at least one matching record is found in either the NICS Index, NCIC or III that provides information demonstrating that receipt of a firearm by the perspective transferee would violate 18 U.S.C. § 922 or state law.

63.    Federal statutory law and/or Federal regulations and/or Federal policy mandated that a search was required to be performed by NICS of the database managed by the FBI, containing information provided by Federal and state agencies about persons prohibited under Federal law from receiving or possessing a firearm.

64.    The database referred to in the preceding paragraph is separate and apart from the NCIC and Interstate Identification Index (III).

65.    During the NICS transaction in April, 2015, referred to above, the second examiner was negligent, careless, grossly negligent and reckless in failing to search the database, managed by the FBI's CJIS Division, containing information provided by Federal and state agencies, including the narrative of the Incident Report provided by SLED referred to above, which contained

information about Dylann Roof, showing Dylann Roof was prohibited under Federal law from receiving or possessing a firearm.

66.    During the NICS transaction in April, 2015, referred to above, information was available in the database, managed by the FBI's CJIS Division, located in the same building as the Second examiner, which contained information provided by SLED about Dylann Roof, showing Dylann Roof was prohibited under Federal law from receiving or possessing a firearm, which information was available as of April 11, 2015.

67.    If the Defendant had complied with the mandatory and non-discretionary Federal statutory law and/or Federal regulations and/or Federal policy which mandated the second examiner to search the database, managed by the FBI, containing information provided by Federal and state agencies about persons prohibited under Federal or state law from receiving or possessing a firearm, the FBI NICS Operation Center second examiner would have received information provided by SLED about Dylann Roof showing Dylann Roof was prohibited under Federal law from receiving or possessing a firearm.

68.    If the FBI NICS Operation Center second examiner had obtained information provided by SLED about Dylann Roof showing Dylann Roof was prohibited under law from receiving or possessing a firearm, Roof would not have been permitted to purchase the semi-automatic Glock pistol he purchased on April 16, 2015 used to murder nine parishioners and to attempt to murder others in the attack on Mother Emanuel AME Church in Charleston, South Carolina.

## COUNT III
## (NEGLIGENCE, CARELESSNESS, GROSS NEGLIGENCE AND RECKLESSNESS)

### A.  FAILURE TO FOLLOW FEDERAL REGULATION MANDATING MAINTAINING DATA INTEGRITY

69.    Each and every allegation set forth above is repeated and reiterated as if fourth verbatim herein.

70.    Federal statutory law and/or Federal regulations and/or Federal policy mandated the FBI to maintain data integrity during all NICS operations that were managed and carried out by the FBI.

71.    One of the operations carried out by the FBI is the operation carried out by the NICS Operation Center that receives inquiries from FFLs and performs background checks to determine whether the receipt or transfer of a firearm

would be in violation of Federal or state law.

72.    The Columbia Police had arrested Dylann Roof on February 28, 2015 on the drug charge in a part of the City of Columbia that lies within Lexington County.

73.    The FBI NICS South Carolina Contact List for Lexington County contained data used during the performance of the Roof background check by the FBI NICS Operation Center in April 2015.

74.    In April, 2015 the South Carolina Contact List for Lexington County contained data maintained during the NICS operation referred to herein that was managed and carried out by the FBI.

75.    Despite the fact that a part of the city of Columbia is and has since 1990 been located in Lexington County the FBI contact list for Lexington County did not include Columbia and/or Columbia Police Department as of April 11, 2015.

76.    Defendant was negligent, careless, grossly negligent and reckless in failing to maintain its data integrity so as to include Columbia and/or Columbia Police Department in the Lexington County Contact List as of April 11, 2015.

77.    If Defendant had complied with the mandatory and non-discretionary Federal statutory law and/or Federal regulations and/or Federal policy which mandated the FBI to maintain data integrity during all NICS operations that were managed and carried out by the FBI, the FBI NICS Contact List for Lexington County would have included Columbia and/or Columbia Police Department as of April 11, 2015.

78.    If the FBI Contact List for Lexington County had included Columbia and/or Columbia Police as of April 11, 2015 the FBI NICS Operation Center would have obtained the Columbia Police Department Incident Report.

79.    If the FBI NICS Operation Center had obtained the Columbia Police Department Incident Report, Roof would not have been permitted to purchase the semi-automatic Glock pistol he purchased on April 16, 2015 used to murder nine parishioners and to attempt to murder others in the attack on Mother Emanuel AME Church in Charleston, South Carolina.

## COUNT IV
## (NEGLIGENCE, CARELESSNESS,
## GROSS NEGLIGENCE AND RECKLESSNESS)

### A. NEGLIGENCE INDIVIDUALLY AND IN COMBINATION RESULTING IN FAILURE TO DENY ROOF APPLICATION TO PURCHASE FIREARM

80.    Each and every allegation set forth above is repeated and reiterated as if set forth verbatim herein.

81.    Federal statutory law and/or Federal regulations and/or Federal policy mandated the FBI NICS Operation Center, upon receiving and FFL telephone or electronic dial up request for a background check, to research criminal history and make a determination based upon available information and to make every effort to obtain the necessary information to make a determination.

82.    Federal law prohibits the sale of a firearm to a person who is an unlawful user of any controlled substance.

83.    Defendant was negligent, careless, grossly negligent and reckless in the failures set forth above including but not limited to failing to properly search criminal history and make a determination based upon available information and/or failure to contact state POC (SLED), or the Columbia Police Department or the Lexington County Court or to search NICS Index to obtain available information or to research and/or review the South Carolina City/County List and/or South Carolina Contact List for Richland County, or to maintain data integrity as to Lexington County Contact List each of which negligence, carelessness, gross negligence and recklessness resulted in the failure to deny the sale of the semi-automatic Glock pistol to Roof, and creation of risk of death and injury to Plaintiff.

84.    If the Defendant had complied with the mandatory and non-discretionary Federal statutory law and/or Federal regulations and/or Federal policy which mandated the FBI NICS Operation Center, upon receiving an FFL telephone or electronic dial up request for a background check, to research criminal history and make a determination based upon available information and to make every effort as set forth above to obtain the necessary information, the second examiner would have contacted the state POC (SLED), or the Columbia Police Department, which she was told had the incident report, or the Lexington County Court, or SLED or searched the NICS Index or would have searched the South Carolina City/County List to determine that the City of Columbia was located in Richland County and used the Contact List for

13

Richland County to obtain sufficient information to contact the Columbia Police Department to obtain the Columbia Police Incident Report (Exhibit 1) and/or the Arrest Warrant (Exhibit 2).

85.    If the NICS Operation Center had obtained the Columbia Police Department Incident Report Roof would not have been permitted to purchase the semi-automatic Glock pistol he purchased on April 16, 2015 used to murder nine parishioners and attempt to murder others in the attack on Mother Emanuel AME Church in Charleston, South Carolina.

86.    The Defendant was negligent in failing to deny the sale of the firearm to Roof.

ECF No. 84, 7-17.

Defendant filed a motion to dismiss for lack of jurisdiction on December 13, 2019. Plaintiffs filed a response in opposition on December 27, 2019, to which Defendant filed a reply on February 2, 2020. The case was reassigned to the undersigned on January 28, 2020. Plaintiffs filed a supplement to their response in opposition on September 23, 2020. The court held a hearing via videoconference on September 29, 2020.

## II.  DISCUSSION

Defendant moves to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) and for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6). In a facial challenge, as Defendant's motion raises, a defendant asserts that the allegations, taken as true, are insufficient to establish subject-matter jurisdiction. See Kerns v. United States, 585 F.3d 187, 192 (4th Cir. 2009). The court then affords a plaintiff the same procedural protection as he would receive under a Rule 12(b)(6) motion. Id. (quoting Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982)). To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

14

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible on its face if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable" and demonstrates "more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556–57). While courts generally do not consider extrinsic evidence when considering a facial attack, they may consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).

Law/Analysis

Pursuant to 28 U.S.C. § 1346(b)(1), the district courts have exclusive jurisdiction over civil actions brought against the United States "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." Defendant contends that Plaintiffs' claims are not cognizable because (1) no private analog exists with respect to the FBI's mandate to determine whether receipt of firearms by prospective purchasers would be unlawful; and (2) even if a private analog exists, South Carolina law would impose no tort liability on a private person under similar circumstances. Thus, according to Defendant, Plaintiffs' complaints fall outside the scope of the FTCA.

A.     Existence of a Private Analog

Defendant asserts that NICS examiners perform functions that no private person is or could be empowered to perform. Defendant states that examiners search FBI-maintained databases and

access records to which no private person has access, and then make a determination whether the prospective purchaser's receipt of a firearm would be lawful.  Defendant argues that once a denial is issued, the firearms dealer has no option but to comply.  Defendant contends that the exercise of such power is analogous to exercises by federal agencies of their quasi-legislative or quasi-adjudicative powers, which conduct is outside the FTCA.  The court disagrees.

In Indian Towing Co. v. United States, 350 U.S. 61 (1955), a tugboat went aground and cargo on a barge was damaged because of the negligence of the Coast Guard in operating a lighthouse. The United States argued, as it does here, that the FTCA excludes liability for the performance of activities on the operational level that private persons do not perform, such that there would be no liability for negligent performance of "uniquely governmental functions."  Id. at 64.  According to the government, there could be "no recovery based on the negligent performance of the activity itself, the so-called 'end-objective' of the particular governmental activity."  Id. at 66. The Court noted that all government activity is "uniquely governmental" in that it is performed by the government.  Id. at 67.  The Court opined that "[o]n the other hand, it is hard to think of any governmental activity on the 'operational level' . . . which is 'uniquely governmental, in the sense that its kind has not at one time or another been, or could not conceivably be, privately performed."  Id. at 68.

The Court found that the language of the FTCA did not support the government's argument. Rather,

> The broad and just purpose which the statute was designed to effect was to compensate the victims of negligence in the conduct of governmental activities in circumstances like unto those in which a private person would be liable and not to leave just treatment to the caprice and legislative burden of individual private laws.

Id. at 68-69.

16

To effect the purposes of the FTCA, "the words 'like circumstances' do not restrict a court's inquiry to the <u>same circumstances</u>, but require it to look further afield." <u>United States v. Olson</u>, 546 U.S. 43, 46 (2005) (citing <u>Indian Towing Co.</u>, 350 U.S. at 64); <u>see also</u> <u>McCloskey v. Mueller</u>, 446 F.3d 262, 267 (1st Cir. 2006) ("In other words, we must look for 'some relationship between the governmental employee[] and the plaintiff to which state law would attach a duty of care in purely private circumstances.'"). The <u>Olson</u> Court explained that the logic of <u>Indian Towing</u> compels a court to consider whether "[p]rivate individuals, who do not operate lighthouses, nonetheless may create a relationship with third parties that is similar to the relationship between a lighthouse operator and a ship dependent on the lighthouse's beacon." <u>Olson</u>, 546 U.S at 47.

Applying the logic of <u>Indian Towing</u>, the court finds that the question is whether private individuals in South Carolina who do not undertake background checks nonetheless can have a relationship with third parties that is similar to the relationship between an examiner and third parties who depend on the examiner to act with due care. The court observes that in South Carolina, an exterminator can be held liable to a third party for negligent preparation of a terminate report. <u>Isle of Palms Pest Control Co. v. Monticello Ins. Co.</u>, 459 S.E.2d 318 (S.C. Ct. App. 1994). A pathology laboratory has been found liable for negligently interpreting and reporting results of a post-partum Pap smear. <u>Hawkins v. Pathology Assoc. of Greenville, P.A.</u>, 498 S.E.2d 395 (S.C. Ct. App. 1998). And recently, in <u>Shaw v. Psychemedics Corp.</u>, 826 S.E.2d 281 (S.C. 2019), the South Carolina Supreme Court held that an independent drug testing laboratory engaged by an employer owed a duty of care to employees subject to the testing. In <u>Shaw</u>, the supreme court determined that the contract between the laboratory and the employer was sufficient to support the recognition of a duty because the purpose of the contract was to test employees' biological specimens for the presence of drugs;

17

that the laboratory possessed and exercised control over the employees' specimens during the testing process; and that it was foreseeable that negligent testing could result in an employee suffering direct economic injury.

The supreme court further observed that:

> a host of public policy considerations . . . favor the recognition of a duty of care in this context. There is a significant public interest in ensuring accurate drug tests because countless employees are required to undergo drug testing as a condition of their employment.  Drug testing laboratories have the greatest amount of control over the accuracy of the testing process. See, e.g., Landon v. Kroll Lab. Specialists, Inc., 22 N.Y.3d 1, 977 N.Y.S.2d 676, 999 N.E.2d 1121, 1124 (2013) (finding drug testing laboratory is in the best position to prevent harm). Conversely, employees have very little control, if any, over the testing procedures and methods used.

> An employee who is terminated for a positive drug test faces immediate consequences, namely the loss of the employee's income and livelihood. Moreover, many employment applications inquire about an applicant's prior work history, including any instance of termination. As a result, the positive drug test and subsequent termination may hinder the employee as he or she seeks new employment. See Duncan v. Afton, Inc., 991 P.2d 739, 745 (Wyo. 1999) ("[T]he likely effect of a false positive result is significant and devastating; employment will likely be terminated and future prospects of employment adversely impacted.").

> Further, without the recognition of a duty, a terminated employee is often left without a means for redress, while the drug testing laboratory is effectively immunized from liability. This risk is especially great in at-will states like South Carolina, in which an employer may terminate an employee at any time without reason or cause. An employee terminated due to a false positive drug test may not fall under an exception to the at-will employment doctrine, and thus would have no recourse against his or her employer. Consequently, a drug testing laboratory is unlikely to face a contribution or indemnity lawsuit from an employer. Therefore, absent a duty of care, drug testing laboratories are able to avoid liability for their negligence.

> Finally, the recognition of a duty in this context advances a major policy goal of tort law: deterrence. In short,

>> [o]ne reason for making a defendant liable in tort for injuries resulting from a breach of his duty is to prevent such injuries from occurring. Underlying this justification is the assumption that potential wrongdoers will avoid wrongful behavior if the benefits of that

> behavior are outweighed by the costs imposed by the payment of damages to victims.
>
> F. Patrick Hubbard & Robert L. Felix, The South Carolina Law of Torts 7 (4th ed. 2011). A drug testing laboratory is more likely to implement measures that ensure better accuracy in its testing process if the laboratory owes a duty of care to an employee. See Lewis v. Aluminum Co. of Am., 588 So. 2d 167, 170 (La. Ct. App. 1991) (stating that subjecting a drug testing laboratory to liability "should foster a greater sense of responsibility within it to perform its drug testing services in a skillful and competent manner").

Shaw, 826 S.E.2d at 283.

In each of these cases, the defendant had a duty to collect, analyze, and report accurate information. The breach of this duty resulted in injury to the respective plaintiffs. The court finds these cases establish a private analog in relation to the negligence theory advanced by Plaintiffs herein. The court also finds persuasive the public policy argument advanced by the South Carolina Supreme Court.

The court also finds instructive In Re Marjory Stoneman Douglas High School Shooting FTCA Litigation, Case No. 20-61103-CIV-DIMITROULEAS, 2020 WL 5648563 (S.D. Fla, Aug. 31, 2020). In re Marjory Stoneman Douglas High School, the plaintiffs were victims of a shooting in Parkland, Florida. Plaintiffs filed complaints against the United States because of failures by the FBI's Public Access Line (PAL) system to pass along a tip regarding the shooter's plans to shoot up the school. The judge in the Douglas High School case noted that the PAL undertook to serve as the nation's core hub, repository, and distribution point for tips about potential threats to life, including mass shootings and school shootings. Id. at *3. The Douglas High School judge noted that Florida's "Good Samaritan doctrine can be particularly useful to courts in finding a private person analogy when the activities at issue are uniquely governmental functions rendering it 'conceptual[ly]

19

difficult[]' to apply the required FTCA analysis." Id. at *11 (citing Zelaya v. United States, 781 F.3d 1315, 1324–25 (11th Cir. 2015)).

Similarly, in South Carolina a person who voluntarily undertakes to act must act with due care. Roundtree Villas Ass'n, Inc. v. 4701 Kings Corp., 321 S.E.2d 46, 51 (S.C. 1984) (citing Restatement (Second) of Torts § 323). A private individual who undertakes to protect others from harm forms an adequate analog to allow Plaintiffs' complaints to withstand Defendant's motion to dismiss as to this issue.

B.    Imposition of Tort Liability

To prove negligence, a plaintiff must show (1) the defendant owes a duty of care to the plaintiff; (2) the defendant breached the duty by a negligent act or omission; (3) the defendant's breach was the actual or proximate cause of the plaintiff's injury; and (4) the plaintiff suffered an injury or damages. Doe 2 v. Citadel, 805 S.E.2d 578, 581 (S.C. Ct. App. 2017) (quoting Roe v. Bibby, 763 S.E.2d 645, 648 (S.C. Ct. App. 2014)). The question presented is whether Defendant's agent owed a duty of care to Plaintiffs under the circumstances.

South Carolina common law recognizes no affirmative duty to control the conduct of another or to warn a third person of danger. Id. However, this rule has five exceptions: (1) where there exists a special relationship between the defendant and the victim; (2) where there exists a special relationship between the defendant and the injurer; (3) where the defendant voluntarily undertakes a duty; (4) where the defendant negligently or intentionally creates the risk; and (5) where a statute imposes a duty on the defendant. Id. Plaintiffs rely on the third and fourth exceptions.[3]

---

[3]Plaintiffs' counsel informed the court at the hearing that they did not wish to pursue an argument that the Brady Act imposes a duty on Defendant.

1.    <u>Voluntary undertaking</u>:  Plaintiffs contend that NICS voluntarily undertook to perform a background check on Roof and negligently performed the background check.  Defendant argues that Plaintiffs' position is at odds with Plaintiffs' allegations that federal statutes, regulations, and policies imposed mandatory and nondiscretionary duties on Defendant with respect to the conduct of NICS background checks.  The court disagrees.

The allegations of the amended complaint speak to the examiner's negligent failure to comply with the mandatory and nondiscretionary "Federal statutory law and/or Federal regulations and/or Federal policy directions" set forth in NICS's SOPs and other directives.  Stated differently, Plaintiffs allege that the examiner failed to use due care in carrying out the mandatory and nondiscretionary tasks she assumed as part of her research into Roof's criminal background.  Plaintiffs' assertion echos the Fourth Circuit's finding: "This case turns instead on the NICS Examiner's alleged negligence in failing to follow a clear directive–contact the arresting agency–contained within the mandatory SOPs." <u>Sanders v. United States</u>, 937 F.3d 316, 331-32 (4th Cir. 2019). <u>See e.g.</u>, <u>Edward's of Byrnes Downs v. Charleston Sheet Metal Co.</u>, 172 S.E.2d 120, 122 (S.C. 1970) (holding that, "[i]f one has entered into the performance of a contract and omits to do some act which it is his duty to do, such may constitute an act of misfeasance or improper performance" for which the tortfeasor may be liable to a third person).

The court also takes note of <u>In Re Madison v. Babcock Center, Inc.</u>, 638 S.E.2d 650, 659 (S.C. 2006).  In that case, the South Carolina supreme court observed:

> The standard of care in a given case may be established and defined by the common law, statutes, administrative regulations, industry standards, or a defendant's own policies and guidelines. <u>See e.g.</u> <u>Steinke v. S.C. Dept. of Labor, Licensing & Regulation</u>, 336 S.C. 373, 387–89, 520 S.E.2d 142, 149–50 (1999) (affirmative legal duty may be created by statute which establishes the standard of care); <u>Clifford v.</u>

Southern Ry. Co., 87 S.C. 324, 69 S.E. 513 (1910) (statute may create special duty of care and breach of that statute may constitute negligence per se); Peterson v. Natl. R.R. Passenger Corp., 365 S.C. 391, 397, 618 S.E.2d 903, 906 (2005) (although federal regulations provided standard of care, internal policies of company which owned the line of track and railroad which owned the train were not preempted by federal law, and company's and railroad's deviation from own internal policies was admissible as evidence they deviated from standard of care, thus breaching duty owed to plaintiff, in lawsuit brought by plaintiff injured in train derailment); Elledge v. Richland/Lexington School Dist. Five, 352 S.C. 179, 186, 573 S.E.2d 789, 793 (2002) (general rule is that evidence of industry safety standards is relevant to establishing the standard of care in a negligence case); Tidwell v. Columbia Ry., Gas & Elec. Co., 109 S.C. 34, 95 S.E. 109 (1918) (relevant rules of a defendant are admissible in evidence in a personal injury action regardless of whether rules were intended primarily for employee guidance, public safety, or both, because violation of such rules may constitute evidence of a breach of the duty of care and the proximate cause of injury); Caldwell v. K–Mart Corp., 306 S.C. 27, 31–32, 410 S.E.2d 21, 24 (Ct. App. 1991) (when defendant adopts internal policies or self-imposed rules and thereafter violates those policies or rules, jury may consider such violations as evidence of negligence if they proximately caused a plaintiff's damages); Steeves v. U.S., 294 F. Supp. 446, 455 (D.S.C. 1968) (violation of a rule or regulation which is designed primarily for the safety of hospital patients will constitute negligence if the violation proximately results in the injury); Restatement (Second) of Torts § 285 (1965) (standards of conduct of reasonable man may be established by statute, regulation, court's interpretation of statute or regulation, judicial decision, or as determined by trial judge or jury under facts of a case).

In the court's view, In Re Madison supports the proposition the that mandatory and nondiscretionary "Federal statutory law and/or Federal regulations and/or Federal policy directions" may establish the standard of care to which a NICS examiner should be held.

The court finds that Plaintiffs have stated a plausible claim for relief so as to survive Defendant's motion to dismiss as to this issue.

2.    Negligent creation of a risk.  Plaintiffs submit that Defendant's failure to issue a "Denied" response to Shooter's Choice after the dealer requested a background check on Roof created or exacerbated the risk that Roof would commit a mass shooting.  Defendant, relying on Restatement (Second) of Torts §§ 321-22, argues that Defendant committed no antecedent act to

create an unreasonable risk of harm.

The court could locate no South Carolina case that relies on sections 321 and 322. Rather, in Johnson v. Robert E. Lee Academy, Inc., 737 S.E.2d 512, 514 (S.C. Ct. App. 2012), the South Carolina Court of Appeals noted that the recognition of a voluntarily assumed duty is rooted in the Restatement (Second) of Torts § 323, which provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.

As an initial matter, the court observes that Director James Comey, on behalf of the FBI, issued a statement setting forth in detail the examiner's activities in conducting the background check on Roof, and concluded that Roof should not have been able to legally buy the firearm from Shooter's Choice. ECF No. 1-1. The FBI's own statement supports Plaintiff's allegations that the examiner's failure to comply with the SOPs increased the risk of harm. In addition, Plaintiffs allege, among other things, that Defendant, through its agents, was negligent in failing to search the available City/County List and available Contact List for Richland County to obtain the incident report from the Columbia Police Department; in failing to contact SLED as a point of contact to obtain the narrative of the Incident Report; and in failing to contact the Lexington County Court or Clerk of Court. Plaintiffs allege that, had the examiner complied with the directives, Roof's arrest would have been verified and his attempt to purchase a weapon at Shooter's Choice would have been denied. Thus, according to Plaintiffs, Defendant's failure to exercise due care increased the risk that

23

Roof would obtain a weapon he was not legally entitled to own and use the weapon to perpetrate the murders at Emanuel AME Church. The court finds that Plaintiffs have stated a plausible claim for relief so as to survive Defendant's motion to dismiss as to this issue.

### III.  CONCLUSION

The court finds that Plaintiffs' complaints contain sufficient factual matter, accepted as true, upon which subject matter jurisdiction can be based. In addition, the court finds that Plaintiffs have stated plausible claims for relief. For the reasons stated, Defendant's motion to dismiss (ECF No. 89) is **denied**.

**IT IS SO ORDERED.**

/s/ Margaret B. Seymour
Senior United States District Judge

Charleston, South Carolina

October 9, 2020

24